**12-370-cv(L)**
*Thurber v. Aetna Life Ins. Co.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————————————

August Term, 2012

(Argued: December 14, 2012      Decided: March 13, 2013)

Docket Nos. 12-370-cv (Lead), 12-521-cv (XAP)

———————————————

SHARON THURBER,

*Plaintiff-Counter-Defendant-Appellant-Cross-Appellee*,

-v.-

AETNA LIFE INSURANCE COMPANY,

*Defendant-Counter-Claimant-Appellee-Cross-Appellant*,

QUEST DIAGNOSTICS, INCORPORATED WELFARE PLAN,
AKA THE QUEST DIAGNOSTICS' AETNA LONGTERM
DISABILITY BENEFIT PLAN, AKA THE QUEST
DIAGNOSTICS' MANAGED DISABILITY BENEFITS
PLAN, THE QUEST EMPLOYEE BENEFITS
ADMINISTRATION COMMITTEE, AS PLAN ADMINISTRATOR,

*Defendants-Appellees-Cross-Appellants*.

———————————————

Before:
          WESLEY, HALL, LYNCH, *Circuit Judges*.


     Plaintiff-Counter-Defendant-Appellant-Cross-Appellee
Sharon Thurber appeals from a January 6, 2012 Decision and
Order by the United States District Court for the Western
District of New York (Skretny, *J.*) granting Defendant-
Counter-Claimant-Appellee-Cross-Appellant Aetna Life

Insurance Company's motion for summary judgment on the issue of whether the insurer improperly denied Thurber long-term disability benefits under ERISA. Thurber argues that the district court used the wrong standard of review and further erred by upholding Aetna's decision denying her long-term disability benefits. Because Aetna's reservation of discretion was sufficient to compel use of the arbitrary and capricious standard of review, we AFFIRM the district court's grant of summary judgment to Aetna on its denial of benefits.

Aetna cross-appeals the portion of the district court's Decision and Order denying Aetna's motion for summary judgment on its counterclaim for equitable restitution of overpaid short-term disability benefits. Aetna argues that the plan language gave it the right to seek reimbursement of overpaid benefits pursuant to 29 U.S.C. § 1132(a)(3). What qualifies as "appropriate equitable relief" under ERISA is an open question in this Circuit. We now hold that Aetna's action seeking return of overpaid benefits was properly brought under 29 U.S.C. § 1132(a)(3) as an equitable counterclaim. We REVERSE the district court's denial of summary judgment on the counterclaim.

AFFIRMED IN PART AND REVERSED IN PART.

––––––––––––––––––––

LISA BALL (Christen Archer Pierrot, Andrew P. Fleming, *on the brief*) Chiacchia & Fleming, Hamburg, NY, *for Plaintiff-Counter-Defendant-Appellant-Cross-Appellee*.

MICHAEL H. BERNSTEIN (John T. Seyberg, *on the brief*), Sedgwick LLP, New York, NY, *for Defendant-Counter-Claimant-Appellee-Cross-Appellant and Defendants-Appellees-Cross-Appellants*.

––––––––––––––––––––

2

WESLEY, *Circuit Judge*:

## Background

Sharon Thurber worked at Quest Diagnostics ("Quest") as a client services representative from 1993 through August 15, 2007. As a full-time Quest employee, Thurber was enrolled in Quest's Employee Retirement Income Security Act (ERISA) disability benefits plan, administered by Aetna Life Insurance Company ("Aetna"). Under the plan, Thurber was entitled to long-term disability benefits if a disabling condition rendered her unable to perform the material and substantial duties of her occupation. According to Thurber's supervisor, her position as a client services representative consisted of sitting for approximately 80% of her shift and alternately standing and walking a short distance for the remaining 20% of the time.

In 1983, Thurber broke both of her legs in a car accident; her right leg is shorter than her left leg as a result. On or about August 17, 2007, Thurber was involved in another car accident, in which she hit a cement barrier twice while driving on the New York State Thruway. She has not worked since that accident. Aetna approved Thurber's initial claim for short-term disability benefits for

3

"traumatic arthritis in both knees."  She received short-term disability benefits for six months, ending on February 20, 2008.

Thurber then submitted a claim for long-term disability benefits.  At this time, she informed Aetna that she had received "other income" in the form of no-fault insurance payments of $1,202.32 per month while receiving short-term disability benefits from Aetna.  Under the plan, Aetna "may" reduce short- or long-term disability benefits if a beneficiary receives "Other Income Benefits," including no-fault insurance payments.  (AR 198.)  In addition, any "[i]ncome earned from a part-time return to work at Quest . . . will result in a reduction" of benefits.  (*Id.*)  The plan also authorizes Aetna to: (1) require the return of overpayments; (2) cease paying benefits until overpayments are recovered; (3) pursue legal action to recover overpayments; or (4) "[p]lace a lien . . . in the amount of the overpayment on the proceeds of any other income."  (*Id.* at 201.)

In support of Thurber's claim for long-term disability benefits based on her "intermittent, unpredictable pain," Thurber's orthopedist, Dr. Michael T. Grant, completed a

4

Capabilities and Limitations Worksheet ("CLW") in November 2007. Dr. Grant indicated that Thurber could engage in occasional sitting and occasional walking, but not in standing, stooping, climbing, crawling, kneeling or twisting, among other limitations. In January 2008, Dr. Grant opined that Thurber "remains totally disabled" due to being "persistently symptomatic in regards to severe post-traumatic arthritis of her knees bilaterally." (*Id.* at 878.) Two months later, another of Thurber's physicians, Dr. Anthony J. Bianchi, completed a second CLW and found that Thurber could frequently (34%-66% of an eight-hour day) sit, stand and walk. Dr. Bianchi noted that Thurber was "still very symptomatic at times," but recommended that she "slowly work up to an 8 hour work day." (*Id.* at 916.)

Based on this information, Aetna denied Thurber's claim for long-term disability benefits on March 31, 2008. Aetna's denial letter summarized the medical reports provided by Thurber's doctors before concluding that the information did not demonstrate that Thurber was unable to perform the functions of her position as a client services representative. Aetna informed Thurber that she could submit any additional information she desired and gave a

5

list of the types of tests and records that might prove helpful. Thurber appealed the denial of benefits in April 2008.

On April 28, 2008, Thurber underwent arthroscopic knee surgery, as suggested by Dr. Grant. Aetna then forwarded Thurber's claim file for an independent medical review by Dr. Lawrence Blumberg, a Board Certified orthopedic surgeon. Dr. Blumberg summarized the medical information provided by Thurber's physicians, but his report wrongly attributed the March 3, 2008 CLW to Dr. Grant, rather than to Dr. Bianchi. Dr. Blumberg determined that "[i]n spite of claimant's subjective complaints, she has an adequate range of motion to perform sedentary activities," as required by her job, because "[t]here is no evidence that she cannot stand, sit, or ambulate." (*Id*. at 951.) In late May, Aetna denied Thurber's claim on appeal and upheld its original decision.

Although the internal appeals process offers only one level of review, Thurber requested reconsideration of her appeal. She subsequently submitted medical information regarding spinal problems in October 2008, specifically, the results of a static EMG scan. Aetna forwarded Thurber's claim file for two additional independent medical reviews,

both conducted by Board Certified orthopedic surgeons. The second independent review physician, Dr. James Wallquist, reviewed Thurber's medical reports and correctly attributed the March 3, 2008 CLW to Dr. Bianchi. Both Dr. Wallquist and Dr. Leela Rangaswamy, Aetna's third independent review physician, concluded that Thurber was functionally impaired from the date of her arthroscopic surgery and for six weeks of recovery thereafter, but not during the periods prior or subsequent. On December 6, 2008, Aetna completed the re-review of its denial of Thurber's claim for benefits and re-affirmed its initial denial.

Thurber filed a complaint in the United States District Court for the Western District of New York (Skretny, *J.*) challenging Aetna's denial of benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B). Aetna counterclaimed for equitable restitution of $7,213.92 in overpaid plan benefits under 29 U.S.C. § 1132(a)(3). Aetna moved for summary judgment on Thurber's claim and its counterclaim. On January 6, 2012, the district court granted Aetna's motion for summary judgment with respect to Thurber's claims but denied and dismissed Aetna's counterclaim for lack of subject matter jurisdiction under ERISA because it was legal, rather than equitable, in nature.

7

Thurber appeals from the district court's grant of summary judgment to Aetna on Thurber's claim for disability benefits; Aetna cross-appeals from the district court's denial of its counterclaim.

## Discussion

**I. Standard of Review**

Thurber argues that the district court should have reviewed her claim *de novo* because she allegedly never received the plan documents that clearly reserved Aetna's discretion to assess her eligibility for long-term disability benefits.  We disagree.

When an ERISA plan participant challenges a denial of benefits, the proper standard of review is *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority" to assess a participant's eligibility.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the plan does reserve discretion, the denial is subject to arbitrary and capricious review and will be overturned only if it is "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  *Kinstler v. First Reliance Standard Life Ins.*

8

*Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)). Although we do not require the plan to employ any particular language to reserve discretion, the chosen words must clearly convey the administrator's intent. *See Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 108 (2d Cir. 2005); *Kinstler*, 181 F.3d at 251-52.

Thurber conceded at oral argument that the plan itself and the Summary Plan Description ("SPD") both include language that is sufficient to reserve discretion to Aetna to assess participants' eligibility for benefits.[1] Thurber argues, however, that there is no evidence in the record showing that she actually received either of these plan documents and that, therefore, she cannot be bound by language contained therein. According to Thurber, the only plan document that she received (the "Booklet") does not clearly reserve discretion to Aetna.[2]

___

[1] The plan provides Aetna with "discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits." (AR 54.) Likewise, the SPD states that "[Aetna] has the discretionary authority to determine eligibility for benefits, decide claim appeals, and to interpret provisions of the plan." (*Id.* at 305.)

[2] The Booklet states that "[a] period of disability will be certified by Aetna if, and for only as long as, Aetna determines that you are disabled . . . ." (Doc. #40, Ex. A, 3.) Because we

9

Thurber relies on the Seventh Circuit's decision in *Herzberger v. Standard Insurance Co.*, 205 F.3d 327 (7th Cir. 2000), for her assertion that she must have received actual notice of Aetna's reservation of discretion before Aetna's denial of benefits is entitled to deferential review. In *Herzberger*, the Seventh Circuit reversed and remanded two district court decisions granting summary judgment to plan administrators after the lower courts reviewed eligibility determinations under the arbitrary and capricious standard. *See id.* at 333. The court held that neither plan at issue clearly reserved discretion to the respective plan administrators. *Id.* The court's analysis rested fully on the language of the plan itself, and concluded that language that simply provided that the administrator had to determine eligibility did not imbue the administrator with discretion. *See id.* In explicating this holding, the court further noted that "[t]he employees are entitled to know what they're getting into, and so if the employer is going to

---

find that the plan's reservation of discretion to Aetna was sufficient regardless of whether Thurber had actual notice of the plan's language, we need not decide the controversial question of whether use of the word "determines" in the Booklet is clear enough to reserve discretion under *Firestone*. *See Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002); *cf. Nichols*, 406 F.3d at 108-09.

reserve a broad, unchanneled discretion to deny claims, the employees should be told about this, and told clearly." *Id.*

Contrary to Thurber's reading, the case did not in any way involve, and the court's language did not address, a situation in which the plan's language *did* unambiguously provide for discretion (as did the SPD), but the employee seeking benefits had not received a copy of either document. That a court will review benefits determinations *de novo* unless the plan documents clearly specify a reservation of discretion does not imply that such a reservation must be specifically conveyed to all members of the plan. In any event, to the extent that the language in *Herzberger* could be read to require actual notice of the insurer's purported reservation of discretion, we cannot detect any basis in law or the statute to support this position. Indeed, the Supreme Court's decision in *Firestone* merely establishes that review under the arbitrary and capricious standard will be inappropriate "unless *the benefit plan* gives the administrator or fiduciary discretionary authority to determine eligibility." 489 U.S. at 115 (emphasis added). *Firestone* says nothing about whether the SPD or other plan documents must contain language clearly reserving discretion

11

– *Firestone* refers to the plan itself.  Although plan participants are entitled to receive copies of the SPD, pursuant to 29 U.S.C. §§ 1021, 1022 and 1024, the administrator of an ERISA plan has no obligation to ensure that participants receive copies of the plan itself.

Thus, unless ERISA requires the SPD to contain language setting the standard of review, we see no reason why a plan administrator must actually notify a participant of its reservation of discretion.  ERISA contains no such edict.  *See* 29 U.S.C. § 1022(b); 29 C.F.R. § 2520.102–3.  Accordingly, to the extent that the Seventh Circuit has articulated an *actual* notice requirement, we disagree that ERISA imposes such an obligation on an insurer that endeavors to reserve discretion.

Here, the language contained in Aetna's plan and the SPD clearly reserves discretion to Aetna for determining participants' eligibility for disability benefits.  That Thurber did not have actual notice of Aetna's reservation of discretion is of no consequence.  There may be strong arguments that plan provisions that affect the basic terms of the plan, or ones that affect what an applicant must do to become eligible for benefits, should be conveyed directly

12

to plan beneficiaries and not buried in a lengthy and technical contract. However, those arguments do not apply to a provision that is effectively addressed not to the beneficiary, but only to a reviewing court that must act only after an application has been denied. Moreover, a standard that focuses on the language of the plan raises a purely legal standard of review for all participants in the same plan. In contrast, an actual notice standard would make the standard of review different for each individual applicant, based on resolution by reviewing courts of factual disputes – which will frequently pit a participant's fallible and self-interested memory against a plan administrator's reliance on evidence of standard practice – about whether the particular participant received a copy of the relevant documents.

As a result, we conclude that the district court correctly utilized the arbitrary and capricious standard of review. We review the district court's grant of summary judgment to Aetna *de novo*, *see Pagan*, 52 F.3d at 441, and thus will review Aetna's denial of long-term disability benefits under the same arbitrary and capricious standard properly used by the district court.

13

**II. The Merits of Thurber's Claim for Benefits**

Thurber makes several arguments on appeal for why Aetna acted arbitrarily and capriciously in denying her long-term disability benefits under the plan. Only some of these arguments have sufficient merit to require discussion. We agree with the district court that Aetna's determination of Thurber's eligibility for long-term benefits was supported by substantial evidence. Accordingly, we affirm the district court's grant of summary judgment to Aetna.

First, Thurber argues that Aetna failed to give enough weight to her subjective complaints of pain. Although subjective complaints "if found credible . . . could [be] legally sufficient evidence of disability," *Krizek v. Cigna Group Insurance*, 345 F.3d 91, 102 (2d Cir. 2003), we agree with the district court that Aetna gave sufficient attention to Thurber's subjective complaints of pain before determining that they were not supported by objective evidence. In Aetna's first denial letter, the insurer "noted that [Thurber] complain[ed] of recurrent discomfort about the right knee." (AR 925.) In its May 2008 denial of benefits on appeal, Aetna commented that "Dr. Blumberg found that in spite of your subjective complaints, you had

14

adequate range of motion to perform sedentary activities." (*Id.* at 947.)  Finally, in Aetna's December 2008 final denial on re-review, the letter confirmed that "[t]he consultant noted that Ms. Thurber had had previous knee pain" and the consultant was aware that "[s]he claimed to have pain, stiffness, and 'fatiguability'" on June 10, 2008. (*Id.* at 1118.)  Aetna did not abuse its discretion in concluding either that Thurber's subjective complaints of pain standing alone did not warrant finding her eligible for long-term disability benefits, or that objective evidence did not support finding otherwise.

Second, Thurber argues that Dr. Blumberg's error attributing the March 3, 2008 CLW to Dr. Grant, instead of to Dr. Bianchi, is a "critical mistake" because Dr. Blumberg "believed that Dr. Grant found Ms. Thurber to have improved."  (Appellant's Br. at 65.)  Even if Dr. Blumberg erroneously believed that Dr. Grant had authored the March 2008 CLW, his recommendation to Aetna was based on the substance of the report – which was the most recent CLW available at the time of his review.  Moreover, after Dr. Blumberg's review and Aetna's denial of Thurber's appeal, Aetna retained two additional independent physicians to

15

review Thurber's file and subsequently affirmed its prior denial based on their (correct) reports.

Third, Thurber claims that Aetna did not give sufficient consideration to the total impact of the medical evidence she submitted to support her claim for disability benefits. As the district court correctly determined, the facts prove otherwise. Each of Aetna's three denial letters, along with the reports from three independent Board Certified physicians, explained why Aetna found Thurber's submissions to be insufficient. In addition, Thurber's claim that Aetna failed to credit the objective medical evidence she submitted regarding her neck and spinal problems also fails. Thurber's initial disability claim and all of the supporting documentation from her care providers up until the fall of 2008 focused on injuries to her knees caused by her August 2007 car accident in conjunction with her 1983 car accident. But, even if Thurber's claim extended beyond disabling knee pain, the third independent physician's review and Aetna's subsequent final denial letter both discuss the tests performed on Thurber's spine, demonstrating that Aetna did not arbitrarily ignore this evidence for purposes of assessing her eligibility for benefits.

We have considered Thurber's additional arguments that the rejection of her claim was arbitrary and capricious and find them without merit.  We affirm the district court's conclusion that Aetna's eligibility determination was supported by substantial evidence.

**III. Aetna's Counterclaim**

Aetna brought a counterclaim seeking the return of overpaid short-term benefits pursuant to ERISA, 29 U.S.C. § 1132(a)(3), which authorizes civil actions brought "by a participant, beneficiary, or fiduciary . . . to obtain . . . appropriate equitable relief . . . to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).  What qualifies as "appropriate equitable relief" is an issue that continues to perplex courts despite efforts by the Supreme Court during the past decade to shed some light on the matter.  *See Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356 (2006); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002).  Here, the district court determined that it did not have subject matter jurisdiction over Aetna's counterclaim because Aetna sought legal, rather than equitable, relief.  Because we are convinced that Aetna's counterclaim seeking the return of

overpaid benefits constituted an action for "appropriate equitable relief," we reverse.

The Supreme Court first tackled the question of whether 29 U.S.C. § 1132(a)(3) authorizes subrogation-like actions by insurers under an ERISA plan in *Great-West Life & Annuity Insurance Company v. Knudson.* There, the insurer paid approximately $350,000 for the participant's medical expenses under her husband's ERISA plan after a car accident. *See Knudson*, 534 U.S. at 207. The Knudsons subsequently settled their state court tort suit against the car manufacturer and other tortfeasors. *Id.* The state court approved the settlement and directed the distribution of approximately $250,000 into a Special Needs Trust that, under California law, would provide for medical care. In addition, the state court allotted nearly $375,000 for attorney's fees and costs; $5,000 to reimburse the California Medicaid program; and approximately $14,000 "to satisfy" Great-West's claim. *Id.* at 207-08. Great-West received notice of the proposed settlement and, "calling itself a defendant," unsuccessfully attempted to remove the state action to federal court on the grounds that the state action "involved federal claims related to ERISA." *Id.* at 208.

Great-West simultaneously sought to block the state court settlement in federal court under 29 U.S.C. § 1132(a)(3), claiming that the plan's subrogation provision required the Knudsons to reimburse Great-West from any third-party payments for plan-covered expenses and precluded the state court from limiting Great-West's recovery to the past medical expenses portion of the settlement. The district court denied Great-West's request for a temporary restraining order and Great-West did not appeal. *Id.* The district court ultimately dismissed Great-West's action after the state court approved the settlement. *See id*.

The Ninth Circuit affirmed the dismissal of Great-West's claim, holding "that judicially decreed reimbursement for payments made to a beneficiary of an insurance plan by a third party is not equitable relief and is therefore not authorized" by the statute. *Id*. at 209. On appeal, the Supreme Court explained that it had previously determined that the statute provided only equitable and not legal remedies to plan administrators to redress violations of the plan or to seek enforcement of plan provisions. *Id.* The Knudsons had not retained any moneys recovered in the state action as those funds were sequestered in the Special Needs Trust pursuant to the state court order. Consequently,

19

Great-West was really trying to enforce its plan provision authorizing the imposition of personal liability if a beneficiary failed to reimburse the insurer after receiving a third-party settlement. *See id.* at 207, 210-12. The Supreme Court saw this as an action at law, for breach of contract, rather than an action at equity, to enjoin the Knudsons from violating the terms of the plan by failing to reimburse Great-West. "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214.

By contrast, in *Sereboff v. Mid Atlantic Medical Services, Inc.*, the insurer sought "specifically identifiable funds that were within the possession and control of the Sereboffs." 547 U.S. at 362-63 (internal quotation marks omitted). Like in *Knudson*, the plan participants in *Sereboff* were injured in a car accident and the insurer paid a sum of money, approximately $75,000, to cover medical expenses under their ERISA plan. *Id.* at 360. Subsequently, the Sereboffs settled a tort suit arising out of their accident. *Id.* Mid Atlantic brought an action under ERISA to enforce a plan provision requiring the

20

beneficiary to reimburse the insurer from third-party recoveries. *Id.* The Sereboffs agreed to set aside a sum of money from their settlement and put it into an investment account until the case had been decided. *Id.*

First, the Court determined that the *nature* of the relief desired in *Sereboff* was equitable because Mid Atlantic sought a specific portion (approximately $75,000) of specifically identified funds (the third-party recovery). *See id.* at 362-63. Second, the Court concluded that Mid Atlantic established that the *basis* for its claim was equitable. *See id.* at 363. The Court discussed the 1914 case (from the time of the divided bench) of *Barnes v. Alexander*, 232 U.S. 117 (1914), in which Justice Holmes described

> the familiar rul[e] of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing.

*Sereboff*, 547 U.S. at 363-64 (quoting *Barnes*, 232 U.S. at 121).

Because the Sereboffs' ERISA plan specifically identified a particular share of particular funds subject to return, Mid Atlantic "could rely on [this] familiar rul[e] of equity to collect for the medical bills it had paid."

21

*Id.* at 364 (internal quotation marks omitted).  "This rule allowed them to 'follow' a portion of the recovery 'into the [Sereboffs'] hands' 'as soon as [the settlement fund] was identified,' and impose on that portion a constructive trust or equitable lien."  *Id.* (quoting *Barnes*, 232 U.S. at 123) (alterations in original).  Moreover, the Supreme Court rebuffed the Sereboffs' contention that Mid Atlantic needed to satisfy "strict tracing rules" before equitable relief was appropriate.  *Id.* at 364-65.  Instead, the Court confirmed that tracing rules have no import in the context of an equitable lien *by agreement*.  *Id.* at 365.

The Court reached different results in *Knudson* and *Sereboff* because Great-West could not assert an equitable lien on settlement funds contained in a separate entity – the restrictive trust – while Mid Atlantic did not face a similar obstacle.  The Sereboffs had possession and control over the specific funds sought by their insurer.  As a result, the Court found that the Sereboffs held these funds in constructive trust for Mid Atlantic.

Here, the nature of Aetna's claim is equitable: the insurer seeks specific funds (overpayments resulting from Thurber's simultaneous receipt of no-fault insurance benefits and short-term disability benefits) in a specific

22

amount (the total overpayment, $7,213.92) as authorized by the plan. These funds were entrusted to Thurber.

However, this case differs from *Sereboff* in two ways. First, the "particular fund" (from which Aetna seeks a specific portion of money) is not the actual third-party income Thurber received; instead, it is the benefits rendered overpayments as a result of Thurber's receipt of no-fault insurance benefits. Second, these overpayments have since dissipated. We do not believe either of these distinctions requires labeling Aetna's claim as one in law, though we recognize the existence of a Circuit split on the issue. *Compare Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 194-95 (3d Cir. 2011) (finding that "dissipation of the funds [is] immaterial" if an equitable lien by agreement is in place), *and Cusson v. Liberty Life Assurance Co. of Boston*, 592 F.3d 215, 231 (1st Cir. 2010) (determining that an insurer need not identify a "specific account in which the funds are kept or prove[] that they are still in [the beneficiary's] possession"), *with Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1093-95 (9th Cir. 2012) (holding that "fiduciar[ies] must recover from specifically identified funds *in the beneficiary's possession*" (emphasis in original)).

23

With respect to the first distinction, Aetna seeks a specific portion (all) of a particular fund (the subset of disability benefits that became overpayments when Thurber received no-fault insurance benefits).  Not surprisingly, these overpayments were not segregated from the total disability payments.  The Ninth Circuit recently held that an action for the return of "overpaid long-term disability benefits" does not seek "a particular *fund*, but a specific amount of money encompassed *within* a particular fund – the long-term disability benefits [the insurer] paid to [the beneficiary]." *Bilyeu*, 683 F.3d at 1093 (emphases in original).  But the beneficiary's literal segregation of funds is irrelevant when the terms of the ERISA plan "put [the beneficiary] on notice that she would be required to reimburse [the insurer] for an amount equal to what she might get from" third-party sources.  *Cusson*, 592 F.3d at 231.

We do not see a basis for distinguishing between certain "funds" identified by ERISA plans – i.e., between "third-party recoveries" and benefits that become "overpayments" as a result of third-party recoveries.  Both constitute particular, identifiable sums over which an insurer may assert an equitable lien authorized by its plan.

24

For this reason, we take issue with the Ninth Circuit's view that the "particular fund" (overpayments) sought lacks sufficient specificity by virtue of being an "undifferentiated component of a larger fund" (total benefits). *Bilyeu*, 683 F.3d at 1093.

Regarding the second distinction, Thurber argues that Aetna may not seek return of the overpayments under 29 U.S.C. § 1132(a)(3) because Thurber has spent the no-fault monies she was required under the plan to deliver to Aetna. This, Thurber argues, makes Aetna akin to a general creditor seeking a sum of money. The Third Circuit takes the position that if "there was an equitable lien by agreement that attached to the [third-party benefits] as soon as [the beneficiary] received it, dissipation of the funds [is] immaterial." *Funk*, 648 F.3d at 194. We believe that this strikes the right balance, and we therefore reject the Ninth Circuit's contrary view that insurers may not reach specifically identified assets that have dissipated. *See Bilyeu*, 683 F.3d at 1094-96. If the reason the insurer's claim is equitable is because it is seeking return of property over which it asserts a lien (the overpayments), whether or not the beneficiary remains in possession of those particular dollars is not relevant as long as she was

25

on notice that the funds under her control belonged to the insurer; she held the money in a constructive trust.

When an ERISA plan creates an equitable lien by agreement between the insurer and the beneficiary, the insurer's ownership of the overpaid funds is established regardless of whether the insurer can satisfy strict tracing rules. *See Sereboff*, 547 U.S. at 364-65; *Bilyeu*, 683 F.3d at 1102 (Rawlinson, *J.*, dissenting). In the context of an equitable lien by agreement, rather than an equitable lien sought as a matter of restitution, all that matters is that the beneficiary did, at some point, have possession and control of the specific portion of the particular fund sought by the insurer. *See Sereboff*, 547 U.S. at 364-65. This is not a case like *Knudson*, in which the beneficiaries never had possession or control of the funds identified for recovery (the settlement). Here, Thurber had possession and control of the overpaid benefits. That she spent the funds over which Aetna exerted an equitable lien is insufficient to void Aetna's right to enforce the plan's subrogation provision and the resulting equitable lien by agreement that Aetna entered into with Thurber.

The basis of Aetna's claim is equitable. The insurer seeks to enforce an equitable lien by agreement on its

26

property – the overpaid funds that Thurber received.  For this reason, Thurber's reliance on *Fehn v. Group Long Term Disability Plan for Employees of JP Morgan Chase Bank*, No. 07 Civ. 8321(WCC), 2008 WL 2754069 (S.D.N.Y. June 30, 2008), is misplaced.  In *Fehn*, the plaintiff received disability benefits that erroneously contained salary-continuation payments, for which the plaintiff was not eligible, resulting in a significant overpayment.  2008 WL 2754069, at *1.  Unlike the insurer in *Sereboff*, because JP Morgan Chase paid the excess funds in error (believing that the plaintiff was entitled to salary-continuation benefits when, in fact, she was not), the company was asserting a contract claim for money paid by the plan in excess of its terms.  It was not seeking recovery of funds held by the defendant that replicated proper plan payments from third parties.[3]  *Id*. at *4.  Thus, the action was legal, rather than equitable.

The district court's conclusion that it lacked subject matter jurisdiction over Aetna's counterclaim rested in part on its belief that the language contained in Aetna's SPD

---

[3] To the extent that the district court in *Fehn* rested its decision on the insurer's inability to "identify segregated funds in plaintiff's possession," 2008 WL 2754069, at *4, we disagree. See *supra* our discussion of *Cusson*, 592 F.3d at 230, and *Funk*, 648 F.3d at 194-95.

27

substantively differed from language in the plans at issue in *Sereboff* and *Cusson*. Aetna's SPD provides that the insurer "may" reduce benefits if a beneficiary receives other income, and "may" require the beneficiary to return any benefits subsequently rendered overpayments. The district court emphasized that the SPD's use of the word "may" "implies a discretionary act, not a conclusive right to the funds." According to the court, this converts Aetna's right to restitution of overpaid benefits into a contractual and legal right, rather than an equitable one. This strikes us as being overly formalistic.

In *Sereboff*, the plan's subrogation language specified the insurer's "right to recover any payments made to you or your dependent by a third party." *Mid Atl. Med. Servs., Inc. v. Sereboff*, 303 F. Supp. 2d 691, 698 (D. Md. 2004). In *Cusson*, the plan gave the insurer "the right to recovery of such overpayments" if a participant received an overpayment on her claim from any source. *Cusson*, 592 F.3d at 230. The district court here cited to these plans as "requir[ing]" beneficiaries to reimburse overpayments to their insurers. But whether the plan "requires" a participant to reimburse an insurer or "may[] [r]equire [the beneficiary] to return the overpayment," as one of four

28

options the insurer "may" pursue, is an immaterial distinction. Under either scenario, reimbursement remains dependent on an act committed to the insurer's discretion, namely, requesting or suing for the return of its property. The insurer must still elect to assert its "right to recover." Or, it *may* opt not to pursue this right.

Likewise, a plan that "may" reduce payments if the beneficiary receives income from other sources adequately reserves the insurer's right to lessen the beneficiary's entitlement to benefits. Here, had Aetna been aware that Thurber was receiving no-fault insurance income while Aetna was still paying short-term disability benefits, the insurer would have had the right to reduce its payments to Thurber, just as it now has the authority to seek return of those overpayments.

We are not persuaded that a different result is compelled by language in Aetna's SPD distinguishing between benefits that "may" be reduced following receipt of "Other Income Benefits" and benefits that "will" be reduced following receipt of income from a part-time return to work. Although we note that Aetna's decision to use two different phrases could signify a meaningful difference, we believe that the insurer's election here is sensible in light of the

29

purpose behind disability benefits: supporting individuals who are unable to work by reason of their impairment. Receiving income from a part-time return to work undermines the very basis for receiving disability benefits; the benefits should never have been paid. Benefits that are overpaid by virtue of the beneficiary receiving additional payments from a third party simply render some portion of the ERISA benefits unnecessary after the fact. Because Aetna had the right to reduce Thurber's short-term disability benefits at the time she received them, Aetna now retains the right under its subrogation provision to compel return of the overpayments.

Thus, the language in Aetna's plan puts a beneficiary on notice that any overpayments she receives belong to Aetna by virtue of an equitable lien by agreement.[4] That the participant takes immediate possession of the overpayments (and perhaps even keeps possession for a certain period of time) has no bearing on Aetna's right to the property nor on its ability to seek return of the overpayments. We note in

[4] Although Thurber did not raise this point in connection with Aetna's counterclaim, even if she never received the SPD, Thurber admitted to possessing the Booklet containing the following language: "[o]ther income benefits . . . will reduce the benefit actually payable." (Doc. #40, Ex. A, 5.)

30

closing that the distinction between claims based in law and those sounding in equity is often fine. In close cases, our inclination is to favor judicial efficiency by allowing ERISA insurers to bring responsive claims in ongoing federal actions, rather than forcing the parties to litigate two actions, one in federal court and one in state court, unnecessarily. Here, because we find that Aetna's plan established an equitable lien by agreement, we hold that Aetna presented a claim for "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3) over which the district court had subject matter jurisdiction. We therefore reverse the district court's dismissal of Aetna's counterclaim and remand to the district court with instructions to enter judgment in favor of Aetna.

### Conclusion

For the foregoing reasons, the order of the district court is hereby AFFIRMED IN PART and REVERSED IN PART.