12-152-cv
Miles v. Principal Life Ins. Co.

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT
_____

August Term, 2012

(Argued: October 5, 2012     Decided: June 26, 2013)

Docket No. 12-152-cv

_____

RALPH MILES,

*Plaintiff-Appellant*,

v.

PRINCIPAL LIFE INSURANCE COMPANY
AND VENABLE LLP LONG TERM DISABILITY PLAN,

*Defendants-Appellees*.

_____

Before:

WALKER and LYNCH, Circuit Judges, and GLEESON, District Judge.[1]


Ralph Miles brings this appeal from an order of the United States District Court for the Southern District of New York (Marrero, *J.*) dismissing his complaint and entering judgment for Defendants-Appellees. The district court held that Principal Life Insurance Company's decision denying Miles's claim for long term disability benefits was not arbitrary and capricious. Reviewing the district court's decision *de novo*, we reverse and remand with instructions to return the case to the plan administrator to reassess the application free of the errors identified in this opinion.

REVERSED AND REMANDED.

---

[1]     The Honorable John Gleeson, of the United States District Court for the Eastern District of New York, sitting by designation.

KEVIN J. BRENNAN, Fabiani Cohen & Hall, LLP, New York, NY, *for Plaintiff-Appellant*,

STEVEN P. DEL MAURO (Valerie G. Pennacchio, *on the brief*), McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ, *for Defendants-Appellees*.

JOHN GLEESON, *District Judge*:

Plaintiff–appellant Ralph Miles appeals from a December 15, 2011 judgment of the United States District Court for the Southern District of New York (Marrero, *J.*). Miles, a partner in a law firm, suffers from bilateral tinnitus accompanied by ear pain, hearing loss, headaches and vertigo. Claiming that these conditions prevent him from performing his job duties, Miles applied for long term disability benefits. When Principal Life Insurance Company ("Principal") concluded that he was not eligible for benefits and denied the claim, Miles filed this action in the district court pursuant to 29 U.S.C. § 1132(a)(1)(B).[2] After a bench trial on a stipulated record pursuant to Federal Rule of Civil Procedure 52, the district court upheld the plan administrator's decision. *Miles v. Principal Life Ins. Co.*, 831 F. Supp. 2d 767 (S.D.N.Y. 2011). We now reverse and remand with instructions to return the case to the plan administrator to reassess Miles's application free of the errors identified in this opinion and, if Principal chooses, to seek additional evidence from Miles in support of his claim.

BACKGROUND

A. *Venable LLP's Plan*

Defendant Venable, LLP Long Term Disability Plan (the "Plan") is an employee benefit plan sponsored by the law firm of Venable LLP ("Venable"), of which Miles was a partner. Principal issued a group Long Term Disability ("LTD") insurance policy to Venable to

---

[2]     29 U.S.C. § 1132(a)(1)(B) affords a right of action to a "participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

provide LTD coverage to eligible Plan participants. The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Principal is the plan administrator and Miles, who was a full-time employee of Venable, is a member of the Plan.

According to the policy's terms, when a Plan member submits "complete and proper proof of Disability," benefits "will be payable." Venable LLP Group Policy ("Group Policy"), Article 5, J.A. 36. As relevant to this appeal, a member will be considered disabled "if, solely and directly because of sickness [or] injury," the member "cannot perform the majority of the Substantial and Material Duties of his or her Own Occupation." Group Policy, Article 1, J.A. 33. The policy defines "Substantial and Material Duties" as "[t]he essential tasks generally required by employers from those engaged in a particular occupation that cannot be modified or omitted," and defines "Own Occupation" as "[t]he specialty in the practice of law the Member is routinely performing for the Policyholder when his or her Disability begins." *Id.* at 34. The policy does not define "sickness" or "injury."

To be eligible for benefits, a claimant must provide "[w]ritten proof that Disability exists and has been continuous." *Id.* at 35. This proof "includes the date, nature, and extent of loss." *Id.* Principal, as the plan administrator, may "request additional information to substantiate loss . . . [and] reserves the right to determine when these conditions are met." *Id.*

B.     *The Administrative Proceedings*

1.     *Miles Applies for Benefits*

Miles, a commercial real estate attorney, worked as a senior equity partner in the New York office of Venable, and was the head of its real estate practice. He stopped working on April 17, 2009, as a result of bilateral tinnitus (high-frequency noises in both ears), intractable ear and head pain, and a feeling of disorientation. He filed his claim for LTD

3

benefits soon thereafter, on May 9, 2009. He was 53 years old at the time he applied for benefits.

On Friday, April 17, 2009, the day he stopped working, Miles made an appointment for the following Monday to see his doctor, internist Dr. Steven Kobren, about the pounding sensation in his ears and head. On April 19, he went to Winthrop Hospital emergency room, believing he was having a heart attack or a stroke. The next day Miles visited Dr. Kobren, seeking help for lightheadedness, dizziness, and loss of balance. Dr. Kobren indicated that Miles suffered from vertigo, "[m]ost likely secondary to [labyrinthitis],"[3] J.A. 292, and referred Miles to Dr. Kenneth Etra, an Ear, Nose and Throat ("ENT") specialist.

Dr. Etra's report indicated that Miles's difficulties commenced about eight months earlier, when he began to suffer bilateral ear pain with tinnitus and hearing loss in his left ear. Then, immediately before he stopped working on April 17, 2009, Miles developed "significant pain in the ears as well as in the head with a pulsation feeling in his head." Dr. Etra identified "two separate problems; one being sinusitis and the second being the sensorineural hearing loss with the tinnitus." *Id.* at 299. He indicated a diagnosis of "[s]inusitis, sensorineural hearing loss, tinnitus, and headache" and placed Miles on steroids and antibiotics. Dr. Etra also referred Miles for a "neurological evaluation due to his fogginess." That same day, a neurologist, Dr. Itzhak C. Haimovic, performed a neurological consultation. His "review of systems" reported as follows: "Significant for tinnitus, vertigo, hearing loss, headaches, lightheadedness, and generalized weakness." He ordered a series of tests, including an electroencephalography ("EEG") and an MRI of the brain, and placed Miles on a medication for musculoskeletal headaches as well as a muscle relaxant.

On May 5, 2009, Miles completed a disability claim form seeking LTD benefits under the Plan, alleging that he was unable to work beginning on April 17, 2009. Disability

---

[3] Labyrinthitis is "inflammation of the labyrinth or inner ear," 18 Oxford English Dictionary 950 (2d ed. 1989).

Claim Form ("Claim Form"), J.A. 151. Dr. Etra filled out the physician portion of the form, listing diagnoses of intractable tinnitus, hearing loss, and headache. Expanding on his diagnoses in an attached letter, Dr. Etra indicated that Miles "complains of a pounding in his head [that is] synchronous with his heartbeat," and opined: "I believe at this time he appears to be with significant tinnitus, hearing loss and intractable head pain. Etiology at this point is undetermined. He seems to be very foggy and unable to concentrate and it seems that he will at the present time be unable to carry on his job."

In further support of his claim, Miles provided a description of his symptoms and the duties and activities he was unable to perform at work as a result of those symptoms. With respect to the former, he stated as follows:

> I have constant pain in my left ear and frequent pain in the right and a generalized painful sensation throughout my head. At times, I would describe the pain in my ears as a pounding sensation. I also have other odd sensations. The left side of my face feels numb and puffy. I feel disoriented with frequent "high frequency" sound in my ears blocking out everything else. These "high frequency" sounds occur even as I sleep, waking me and leaving me sleep deprived on many mornings. When I went to the emergency room on April 19 I was afraid I might be having a stroke. Since then, my doctors have diagnosed tinnitus and vertigo, and the pain and the sense of disorientation have continued.

*See* Claim Form, J.A. 155. As for the demands of his employment, Miles stated:

> My work as a large-firm commercial real estate partner has involved several main duties: communicating with others (including lengthy negotiation sessions) in person, by phone, and via computer or Blackberry; reading and understanding complex documents (both paper and electronic); drafting and revising dense and often lengthy documents; memorizing detailed facts; thinking about difficult problems and devising solutions; and supervising the work of associates assigned to work with me. All these tasks must be done both quickly and carefully, often under significant time pressure, and sometimes late into the night.

*Id.* He concluded that, "[b]ecause of these problems, especially the pain, I am not able to read for any length of time and cannot concentrate adequately to address the complicated issues

typical for my work day. The last day I tried to work was Friday, April 17, but the pain and disorientation made it impossible for me to do my work at all." *Id.*

## 2. *Principal's Initial Investigation*

Principal's claim examiner conducted a lengthy telephone interview of Miles on August 10, 2009. Forty-five minutes into the interview Miles lost his concentration and asked for a 20-minute break to lie down. When the interview resumed, he explained the nature and demands of his employment as a real estate lawyer. The claim examiner's notes state, in relevant part, as follows:

> [On Thursday] April 16, 2009 . . . as [Miles] was driving, he began to feel disorientated . . . . As evening wore on, he began to have something like pounding sensation in ears and head . . . . Did not pass with time and even when went to bed it was still persisting, but felt if he got thru day it would begin to wear off. Went to work [on Friday, April 17], but whole day nothing changed . . . and he called the doctors (sic) office . . . . Made an appointment to see Dr. Kobren . . . on 4/20/09.

> [On Sunday April 19, Miles] went to ER . . . as the pounding sensation in ears and head was more rapid . . . . [On April 23, Miles s]aw Dr. Etra . . . . Told him overview of symptoms and beyond pain [he had] constant ringing in ears, high pitched sound . . . . Continues to have severe pain in left ear and hearing loss, pain in head, creates a lack of concentration . . . .

> Restrictions: Constant tinnitus, pain in ears, disorientation daily and constant . . . . [His work] involved very intense negotiations and all forms whether in person or phone, he would get novel documents to review and comment on prior to multi million dollar transactions and billions of dollars of real estate loans. Long hours, and it really takes a lot of concentration and a lot of focus . . . . Ability to concentrate and focus for long periods of time is not something he can perform.

J.A. 167-69.

There was no indication in the record that Miles stopped working at Venable for any reason other than the above-described symptoms. Nevertheless, three weeks after the telephone interview of Miles, the claims examiner called Venable's Benefits Coordinator and explained that it "need[ed] to know what actually happened at [the] time Ralph stopped

working." Specifically, Principal "[a]sked [the Benefits Coordinator] if she can confirm if termination was due to [a] medical condition, or other reasons." The Benefits Coordinator, who worked in the Washington, D.C. office of Venable, not in New York, reportedly answered that "she thinks it was other reasons, but will need to make some additional phone calls." The record indicates that Principal left two follow-up voicemail messages with the Benefits Coordinator, neither of which was returned.

### 3. *Miles's Offer to be Examined*

October 10, 2009 marked the end of the 180-day "elimination period" under the policy, and Miles's attorney contended that Miles was entitled to benefits beginning one month after that date. On October 16, 2009, the attorney, frustrated by the fact that he had not heard from Principal for about two months, asked why Principal had not simply sent Miles for an examination. Principal explained that it typically did not do that, but rather relied on the information from treating physicians and exercised its discretion to schedule an examination only if that information proved inadequate.

### 4. *The October 27 Letter: Principal Informs Miles that it Needs Additional Information in Order to Complete its Evaluation*

On October 27, 2012, Principal sent Miles a letter indicating that it had received "medical records from all of the physicians,"[4] but it lacked information "from them regarding specific restrictions and limitations they have placed upon you that would prevent you from continuing to perform your" occupation. Letter from Principal, Oct. 27, 2009, J.A. 39. The letter further stated that the "testing that has been performed, other then (sic) the auditory testing we recently received from Dr. Etra, indicates normal findings." *Id.* Although Principal acknowledged that Miles had provided them with his "occupational functions with Venable," the letter concluded that "it is unclear what specific functions you are precluded from

---

[4]     The listed physicians were Dr. Etra, Dr. Haimovic, and Dr. Kobren. Dr. Kobren's records included letters to him from a Dr. Blanck and a Dr. Makovsky.

performing as an Attorney, or what condition/conditions are of the severity to prevent you from performing your own occupation . . . ." *Id.* Under the heading "Information Needed to Continue Our Evaluation," Principal stated as follows:

> Medical documentation to support the severity of symptoms you experience related to your condition, and confirmation from your treating physician regarding what specific restrictions and limitations they have imposed, which prevent you from performing your own occupation effective April 17, 2009 through the present time.

*Id.* The letter also informed Miles that Principal had asked an ENT specialist and a neurologist to review the claim.

5.      *Miles's Response to the October 27, 2009 Letter*

In a letter dated November 9, 2009, Miles's attorney disputed Principal's assertions that the specific functions Miles could no longer perform and the conditions that prevented him from performing them were unclear. Citing the evidence already submitted to Principal, counsel asserted that Miles suffered from intractable tinnitus, vertigo, severe hearing loss, ear pain, and headaches, and that those conditions prevented Miles from communicating with others (including lengthy negotiation sessions), reading and understanding complex documents, drafting and revising such documents, memorizing numerous factual details, thinking about and devising solutions for difficult legal and transactional problems, and supervising associates, all of which tasks sometimes required working late into the night. The attorney expressed confusion why this "clear proof" was insufficient to satisfy the specific language of the policy. Counsel's letter also asked for an opportunity to review and comment on any reports from the neurology and ENT specialists Principal had stated it would retain.

6.      *Principal Retains Independent Medical Evaluators to Review Miles's File*

On November 18, 2009, Principal engaged two specialists from Reliable Review Services – neurologist Dr. Bruce LeForce and otolaryngologist (*i.e.*, ENT specialist) Dr. Thomas Klein – to conduct a "peer file review." Principal specifically instructed Dr. LeForce to call Dr.

8

Haimovic, Miles's treating neurologist, "to discuss his findings and find out what he feels is impeding work." Though Dr. LeForce attempted to do so twice, Dr. Haimovic indicated that he had not been provided with a release, so he could not discuss Miles with Dr. LeForce. In his assessment, Dr. LeForce stated that "[t]here are no objective findings to support impairment from a neurological perspective. There are no restrictions or limitations supported by the information provided. He is capable of full time work." Lead Advisory Report, J.A. 350-52.

Dr. Klein completed a "Secondary Advisory Report." Whereas Dr. LeForce had been unable to consult with the treating neurologist, Dr. Klein consulted with Miles's treating ENT physician, Dr. Etra. Dr. Klein's report attributed to Dr. Etra the impression "that the tinnitus was subjective and the vertigo was not a real problem and the headaches were not related to ear, nose or throat; nor was the fogginess related to ear, nose or throat." Secondary Advisory Report, J.A. 354. When asked about restrictions and limitations, Dr. Klein concluded that "[t]here is [a] lack of objective findings . . . to support the need for restrictions and limitations on work activities from an otolaryngology prospective (sic)." He also noted a "lack of objective findings to support . . . the claimant's subjective complaints." *Id.* at 355. In conclusion, Dr. Klein emphasized that the file lacked observable, objective information confirming that Miles is disabled:

> While the claimant has a history of hearing loss, vertigo and ear pain, with the exception of the hearing loss there is no clinical documentation . . . from the treating provider that clearly details any significant or severe positive objective findings or significant severe functional limitations occurring that would have prevented his return back to his regular job. The observeable (sic) information provided does not clearly support severity of impairment with significant limitations of functioning.

*Id.*

7.     *Principal's Initial Denial of Miles's Claim*

Principal did not respond to Miles's attorney's November 9 letter or allow counsel to comment on the reports from Dr. LeForce and Dr. Klein. Rather, on December 8,

9

2009, it informed Miles that it had completed its review of his claim and decided to deny it. *See* Initial Denial, J.A. 45-50. Principal provided a series of reasons for this decision. First, it pointed out that Dr. Etra had indicated "none" in "the portion of the work status sheet which asks the physician for specific restrictions." *Id.* at 46. Specifically, Dr. Etra wrote "none" in a box asking whether he had restricted the number of hours Miles can sit, stand, stoop, use his hands to push or pull, etc. Immediately above this box on the Work Status Sheet, Dr. Etra stated that Miles was "unable to work" due to "hearing loss, vertigo, [and] tinnitus." Work Status Sheet, J.A 343. However, Principal did not mention the latter information in its initial denial.

Second, Principal's denial stated that "[a]lthough [Dr. Etra's] work status sheet primarily outlines physical restrictions . . . , Dr. Etra did not identify other conditions, such as concentration, headaches, or hearing loss as being of the severity these (sic) would preclude you from returning to *your own occupation*." Initial Denial, J.A. 47 (emphasis added). Actually, as mentioned above, Etra's work status sheet states unequivocally that Miles is unable to work due to hearing loss, vertigo and tinnitus. Work Status Sheet, J.A 343.

Third, Principal indicated that "[i]t is not clear what . . . transpired on April 17, 2009 to prevent you from returning to work following this date." Initial Denial, J.A. 47. Fourth, Principal noted that its claims examiner "did not have difficulty with verbal communication" with Miles during the August 10, 2009 phone interview. *Id.* Fifth, Principal quoted Dr. Klein's summary of his conversation with Dr. Etra; according to Dr. Klein: "Dr. Etra also felt that the tinnitus was subjective, the vertigo was not a real problem[,] and the headaches were not related to ear, nose or throat; nor was the fogginess." *Id.*

Principal's initial denial acknowledged that the reviewing neurologist, Dr. LeForce, had not discussed Miles's case with the treating neurologist, Dr. Haimovic. However, Principal placed the blame for that as follows: "Dr. Haimovic would not discuss you as he indicated he did not have proper authorization. But, *Dr. LeForce* had forwarded an

10

authorization to Dr. Haimovic on two separate occasions." *Id.* (emphasis added). This was inaccurate. In fact, Dr. LeForce's report states only that he had asked RRS – the service through which he had been retained – to send the release to Dr. Haimovic.[5]

> In summary, Principal stated as follows in declining Miles's claim:
>
> While you have a history of hearing loss, vertigo and ear pain, with the exception of the hearing loss there is no clinical documentation available for review from the treating providers that clearly states . . . any significant severe functional limitations . . . that would have prevented you from returning back to your regular job. The observable information provided does not clearly support the severity of impairment with significant limitations of functioning. Therefore, we are declining your claim for Long Term Disability Benefits as the information we have received does not support the severity of symptoms related to a condition/conditions that would prevent you from performing your Own Occupation.

Initial Denial, J.A. 48.

After laying out the above reasons for denying his claims, Principal informed Miles that he had the right to appeal. Principal directed that Miles provide "[m]edical information," "testing," and "results" to meet his burden of proof on appeal. *Id.* at 49. Specifically, it indicated that he should provide: (1) "testing to support the severity of your condition/conditions"; (2) an explanation from his treating doctors "outlining upon what medical basis they would support your inability to perform your occupation"; (3) "[m]edical records, testing and results . . . that supports (sic) your inability to return to your own occupation with the use of [a] hearing aid."; (4) "[r]esults of cognitive testing with findings of the severity that they (sic) impact your ability to concentrate, and a physician who will support [that] these results . . . would have prevented you from performing your own occupation as of April 17, 2009"; and (5) "[s]pecific restrictions and limitations from your treating Physician with a diagnosis or

---

[5] It is undisputed that Miles had executed a release authorizing Principal to speak to any physician or healthcare provider that had provided any kind of treatment within the past ten years. Auth. For Release, J.A. 291. Moreover, Miles's attorney had offered his assistance to obtain paperwork from Miles's doctors when Principal had, in the past, attributed delays in processing Miles's claim to difficulty in obtaining medical information. J.A. 44.

symptoms . . . includ[ing] medical documentation to support these restrictions . . . [and] sustained functional limitations due to your disabling diagnosis." *Id.*

### 8. *Miles Requests Review of the Denial*

On September 27, 2010, Miles sought review of the denial of his claim. He argued that Principal's reasons for denying his claim were not supported by the record proof and submitted more than 60 pages of additional information in support of the claim. Specifically, he included updated reports from Dr. Etra and Dr. Haimovic (both dated September 23, 2010) and the results of videonystagmography ("VNG") testing.[6] In his report, Dr. Etra explained that tinnitus was Miles's most significant issue and elaborated on his clinical findings:

> It is a roaring tinnitus which is constantly in [Miles's] head. In addition, he has significant ongoing headaches due to the tinnitus. He has been fully worked up and has had all treatment modalities that are available, yet despite this, the hearing loss has remained profound . . . . [The tinnitus] is a subjective complaint. It clearly is completely consistent with the degree of hearing loss. Patients who have this degree of tinnitus have significant inability to concentrate and perform ongoing significant mental tasks that require this prolonged concentration.

Letter from Dr. Etra, Sept. 23, 2010, J.A. 84

Miles also included: (1) records related to "vertigo-related injuries" that occurred in February 2010, J.A. 59-60; (2) a report from physical therapist Dr. Sheetal Desai, who summarized objective findings[7] in support of Miles's diagnosis and opined that Miles's

---

[6]    Videonystagmography ("VNG") is a series of tests used to determine the causes of a patient's dizziness or balance disorders. The test works by documenting a person's ability to follow visual objects with their eyes and how well the eyes respond to information from the vestibular system. *See* Videonystagmography, http://www.jeffersonhospital.org/tests-and-treatments/videonystagmography (last visited June 21, 2013). The audiologist who conducted Miles's VNG test opined that "[t]he vestibular findings in conjunction with the complaints of tinnitus and hearing loss may suggest Meniere's disease," a disorder of the inner ear. Patient Report – VNG Test, J.A. 77. In a follow-up letter, Dr. Haimovic opined that "the patient's sensation of true vertigo, dizziness, balance disorder, fogging, and difficulties with concentration are all supported by the abnormal [VNG]," and that Miles "has received symptomatic therapy for more than a year now without any improvement." Letter from Dr. Haimovic, J.A. 83.

[7]    Dr. Desai described, *inter alia*, the results of the VNG, which "suggests caloric responses of right ear 31% weaker than Left ear and abnormal gain asymmetry with left beating caloric responses 28% stronger than right beating caloric responses." J.A. 79. Dr. Desei concluded that Miles's VNG indicated "optikinetic and horizontal tracking results [that] were abnormal bilaterally," and that these "limitation[s] affect[] the essential tasks of his own occupation." *Id*. (internal quotation marks omitted). Dr. Desai also discussed the results of an MRI of the cervical spine in 2010, which showed disc abnormalities.

"significant pain in neck, headaches, tinnitus, ringing in ears and loss of hearing . . . limit[] his ability to . . . sit through lengthy negotiation sessions . . . sit at a desk and read for an extended period of time . . . [and] writ[e] and draft[] papers," J.A. 78-79; (3) a "physical residual functional capacity questionnaire" completed on March 11, 2010 by Dr. Haimovic, which indicated, *inter alia*, that Miles's symptoms "interfere with attention and concentration . . . [c]onstantly," J.A. 71-72; (4) a new medical report from Dr. Michael Gordon, an ENT specialist, who stated his "impression . . . that Mr. Miles has objective evidence of conductive hearing loss in his left ear as well as evidence of probable vestibular dysfunction in his right ear," and further indicated that Miles "is experiencing troublesome tinnitus in both ears, which cannot be measured objectively." J.A. 82. Dr. Gordon opined that Miles's "constant headaches cannot be explained on the basis of otologic disease, [but] it is possible that his tinnitus and vestibular function resulted from systemic factors that also cause the headaches," J.A. 82; (5) and Dr. Gordon's opinion that a hearing aid would not alleviate Miles's disequilibrium or tinnitus.

Miles also objected to Principal's focus on the lack of objective information confirming the cause of Miles's tinnitus, noting that "the Plan language requires that Mr. Miles prove that he suffers from a sickness but does not also require that he prove the cause of that sickness." J.A. 60. Miles pointed out that the initial denial did not dispute the truthfulness of any of Miles symptoms, including their persistence, severity intensity, and duration. *Id.* at 55. In fact, Principal's denial letter "did *not* state that the Plan did not credit" Miles's statement about his symptoms and, thus, Miles argued that his symptoms ought to be considered undisputed. *Id.* at 53 (emphasis in original). Miles also objected to the fact that Principal did not "identify any . . . objective findings or limitations that, considering Miles' undisputed symptoms, the Plan would reasonably have expected to see." *Id.* Finally, Miles argued that "Principal's express reliance on the absence of 'restrictions and limitations' . . . violated

13

Principal's . . . fiduciary duty to decide Mr. Miles' claim in accordance with the terms of the Plan." *Id.* at 56.

9. *Miles is Awarded Disability Benefits from the Social Security Administration*

After Miles's appeal letter was sent to Principal, the Social Security Administration ("SSA") found that he had been disabled since April 16, 2009. Miles sent the SSA decision to Principal and asked it to consider the decision in its review. The Commissioner of SSA concluded that Miles has the following severe impairments: hearing loss; vertigo; tinnitus; and cervical impingement with radiculopathy. Miles was found to be disabled at step three of the Commissioner's five-part disability inquiry.[8] Decision of the SSA, J.A 134. Specifically, the Commissioner concluded that Miles's impairments meet the criteria of listing 2.07: "Disturbance of labyrinthine-vestibular function (including Meniere's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing."[9] In reaching this conclusion, the Commissioner specifically found that Miles was credible:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible. In evaluating the record, I note that the clamant has a long work history, which enhances his credibility.

Decision of the SSA, J.A. 135.

---

[8]     SSA regulations prescribe a five-step process for evaluating disability claims.
>     First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks and brackets omitted).

[9]     *See* Social Security Administration, Appendix 1 to Subpart P of Part 404—Listing of Impairments, http://www.ssa.gov/OP_Home/cfr20/404/404-app-p01.htm (last visited June 21, 2013).

14

### 10. *Principal Requests Additional Independent Medical Evaluations*

As mentioned above, in October 2009 Principal declined Miles's lawyer's suggestion that Principal conduct an in-person examination of Miles during the initial review of his claim. However, a year later, in connection with Miles's request for review of the initial denial of benefits, Principal requested that Miles submit to physical examinations. Principal asserts that Miles refused to submit to these exams, but the record reveals a more nuanced dispute over their permissible scope. We need not decide here whether Principal had an unfettered right to require such exams.[10]

Principal retained additional independent experts to review Miles's file. ENT specialist Dr. Robert Carpenter from Reliable Review Services and neurologist Dr. Leonid Topper from MES Solutions reviewed the file and submitted written reports in response to questions posed by Principal. Dr. Carpenter reported that the diagnoses on which Miles's claim rested were in fact substantiated by objective findings: "left mixed hearing loss, mostly conductive[;] right vestibular weakness[; and] cervical disc disease," and that "there are no objective tests for tinnitus." Dr. Carpenter Advisory Report, Nov. 15, 2010, J.A 148. Dr. Carpenter further stated that Miles "stopped working because of the headaches and foggy feeling along with the loud tinnitus." It was his prognosis was that, absent successful treatment,[11] Miles would suffer a "continuation of the same symptoms." *Id.* at 149. Nevertheless, in response to the question: "What restrictions and limitations would you recommend," Dr. Carpenter responded: "From the objective data in the medical records, there appear to be no *physical* limitations or restrictions." *Id.* (emphasis added).

---

[10] The district court noted that "Principal continued with its review and did not base its Final Determination on Miles's refusal," and thus declined to consider whether Miles was obligated under the terms of the policy to attend the examination. *Miles*, 831 F. Supp. 2d at 774 n.2. Principal does not appeal the district court's refusal to resolve this question on the merits. Accordingly, this question is not before us, and we decline to consider it.

[11] Dr. Carpenter observed that Miles's hearing loss and right vestibular weakness "may possibly be further treatable." J.A 150.

Dr. Topper stated that "[t]he medical records fail to document any specific neurological diagnosis that would explain at least a larger part of the claimant's symptoms. Specifically, the claimant's difficulty concentrating and daily headaches are essentially self-reported . . . ." Peer Review Report, Jan. 25, 2011, J.A. 127. He opined that the "self-reported complaints cannot be explained by any known neurological condition." Peer Review Report, Nov. 17, 2010, J.A. 143. Finally, Dr. Topper opined, *inter alia*, that Miles's "headaches [were] reported to happen in the claimant's fifth decade of life, which is not typical for primary headaches . . . . [T]he claimant's headaches do not match a typical pattern of migraine . . . [and] [t]hese headaches have multiple symptoms which are not typically seen in migraines . . . ." Peer Review Report, J.A. 122.

11. *Principal's Final Decision Denying Miles's Claim*

On February 11, 2011, Principal issued a final decision reaffirming its decision to decline Miles's claim for benefits. Principal explained that "[t]he medical documentation . . . received does not support a medical condition that would preclude Mr. Miles from performing his occupation." J.A. 540. It again stated that it was unclear "what changed in [Miles's] condition in April of 2009, to prevent him from working," noting that it had attempted to get this information about his employment history but Venable had "declined to discuss this with us."[12] J.A. 542. It summarized the medical reports to date, and noted that "[t]he tinnitus did not find an explanation by ENT or by neurology . . . [and] [m]any of the complainant's complaints do not match the findings of neurological examination." *Id*. It concluded that Miles's "description

---

[12] As mentioned above, Principal's claims investigator called Venable's Benefits Coordinator almost four months after the claim was filed and explained her "need to know what actually happened" when Miles stopped working, that is, whether his departure from the firm was due to "medical conditions, or other reasons." J.A. 261. Based on an offhand remark by that Benefits Coordinator (who did not even work in the same office as Miles) that there might be another reason for Miles's departure from work, Principal pursued that possibility for almost two months. As its counsel conceded at oral argument, see Oral Arg. Recording at 11:25:00, the effort unearthed nothing, as it appears that Venable never returned Principal's calls. Accordingly, there is literally no evidence in the record of any reason why Miles stopped working other than his symptoms, and indeed the only statement in the record on the subject from the Benefits Coordinator is that Miles's employment ended because of "illness." J.A.151. The admitted absence of any support for it did not deter Principal from including the following statement in its brief to this Court: "[The Benefits Coordinator] thought [Miles's] termination was due to a reason other than his medical condition." Appellee Br. at 9.

of his symptoms . . . does not match any recognizable pattern of any primary or secondary headaches syndrome known to neurologists," and therefore rejected his claim for LTD benefits. *Id.* at 545.

C.       *The Procedural History of this Case*

Miles brought this action challenging Principal's denial of his claim, asserting that he "met all of his obligations under the terms of the Policy and the Plan," and that Principal "arbitrarily and capriciously denied [his] claim for benefits and then arbitrarily and capriciously failed to provide a full and fair review of that denial." Am. Compl. ¶¶ 18, 26, J.A. 10.

The parties consented to a bench trial on a stipulated administrative record pursuant to Federal Rule of Civil Procedure 52. The District Court reviewed Principal's initial determination and concluded that it was supported by substantial evidence and that it was neither arbitrary nor capricious. *Miles*, 831 F. Supp. 2d at 775-78. Specifically, it held that Principal (1) reasonably relied on Miles's failure to demonstrate "restrictions and limitations" as a basis to deny his claim; (2) did not err by failing to expressly state whether it credited Miles's subjective complaints; and (3) reasonably required objective proof of a significant impairment.

Because the district court concluded that the initial denial was neither arbitrary nor capricious, it reviewed the final determination solely to determine if Principal afforded Miles a full and fair review of the initial denial decision. *Miles*, 831 F. Supp. 2d at 778. Concluding that the final decision "considered and addressed both the proof submitted before the Initial Determination and the additional proof submitted during the appeal," the court concluded that Miles was accorded the full and fair review to which he was entitled prior to the final determination denying his claim. Accordingly, it directed the entry of judgment dismissing the complaint. This appeal followed.

17

DISCUSSION

A.    *Standard of Review*

This appeal centers on the legal significance of the facts in the administrative record that was jointly submitted to the district court. The district court did not hear witness testimony or make any credibility determinations; rather, it reviewed the record and made legal conclusions based on its contents. Accordingly, we review the district court's legal conclusions *de novo. LoPresti v. Terwilliger*, 126 F.3d 34, 38-39 (2d Cir. 1997).

Judicial review of a plan administrator's underlying benefits determination is reviewed *de novo* unless, as here, the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Since the parties agree that Principal has such discretionary authority, this Court applies a more deferential standard, seeking to determine only whether the administrator's decision was "arbitrary and capricious." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir. 2003) ("[P]lans investing the administrator with broad discretionary authority to determine eligibility are reviewed under the arbitrary and capricious standard."). Thus, despite our *de novo* review of the district court's decision, we accord substantial deference to Principal's underlying determination denying Miles's claim. However, courts may dial back deference if "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest." *Bruch*, 489 U.S. at 115.[13]

---

[13]    In reviewing an administrator's decision under the deferential "arbitrary and capricious" standard, we remain cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111, 114 (2008); *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138 (2d Cir. 2010). "The weight properly accorded a *Glenn* conflict varies in direct proportion to the likelihood that the conflict affected the benefits decision." *Durakovic*, 609 F.3d at 139 (internal quotation marks and brackets omitted). We agree with the district court that there is no evidence that Principal has a history of biased claim adjudication. *Miles*, 831 F. Supp. 2d at 776. The question of conflict is to be considered anew if, after remand to Principal for reconsideration of the claim, this case returns to the federal courts for additional review.

A decision is arbitrary and capricious only if it is found to be "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) (internal quotation marks omitted). "[W]here the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008) (quoting *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 93 (2d Cir. 2000)). Further, where, by their interpretation, the trustees of a plan "render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." *Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Emp. Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir. 1983).

B.    *Analysis*

1.    *Principal Failed to Properly Consider Miles's Subjective Complaints*

This Court has long recognized that subjective complaints of disabling conditions are not merely evidence of a disability, but are an "important factor to be considered in determining disability." *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001) (quoting *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984)). In *Connors*, the district court described a claimant's alleged disability as "a subjective matter," and disregarded subjective evidence of pain in its assessment of the disability claim. We reversed, concluding that the court "erred in discounting Connors's complaints of pain as merely 'subjective,'" and holding that courts may not "dismiss complaints of pain as legally insufficient evidence of disability." *Id.* at 136. *Connors* and other decisions by this Court have made it clear that it is arbitrary and capricious to disregard evidence simply because it is subjective. *See, e.g.*, *Thurber v. Aetna Life Ins. Co.*, 712 F.3d 654, 660 (2d Cir. 2013) (noting that the plan administrator must give "sufficient attention to . . . subjective complaints"); *Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 101-

02 (2d Cir. 2003) (noting that it is error to reject subjective evidence simply because it is subjective); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) ("[T]he subjective evidence of appellant's pain, based on her own testimony and the medical reports of examining physicians, is more than ample to establish her disability, if believed.")

Thus, a reviewing court is obliged to determine whether a plan administrator has given "sufficient attention to [the claimant's] subjective complaints . . . before determining that they were not supported by objective evidence." *Thurber*, 712 F.3d at 660. If the subjective evidence is not credited, Section 503(1) of ERISA mandates that the plan administrator provide the claimant with "adequate notice in writing . . . setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). This notice requirement is essential to fair claims administration, as it is meant to "provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 87 (2d Cir. 2009) (quoting *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000)).

Looking to the record before us, we conclude that Principal did not give adequate attention to Miles's subjective complaints, as it failed to either assign any weight to them or to provide specific reasons for its decision to discount them. Instead, in its initial denial, Principal cited Dr. Etra's statement that "the tinnitus was subjective" as a reason for denying Miles's claims. *See* Initial Denial, J.A. 47; Appellee Br. at 17. Pointing out that evidence is "subjective" is not, by itself, a proper basis to reject evidence. *Connors*, 272 F.3d at 136. Moreover, Principal failed to mention that Dr. Etra himself had found these subjective complaints credible, concluding that Miles "appears to be with significant tinnitus, hearing loss, and intractable head pain." Claim Form, J.A. 274. As Principal cites to no reason to discount

20

the evidence (other than its subjective nature), we conclude that Principal arbitrarily rejected Miles's subjective evidence of disability.

In its final determination, Principal continued to point to the subjective nature of Miles's complaints as the only basis for disregarding the evidence. For example, Principal stated that Miles's "self-reported loss of orientation and concentration was never verified by objective testing and remained self-reported only," and pointed out that "[m]any of the claimant's complaints . . . [were] never observed by his neurologist and [were] never confirmed by exams." Final Determination J.A. 545 (internal quotation marks omitted). However, as discussed above, pointing out that evidence is "subjective" is not, standing alone, a reasonable basis on which to accord that evidence limited weight. Since subjective evidence is "more than ample to establish [Miles's] disability, if believed," *Marcus*, 615 F.2d at 27, Principal must do more than simply point to the subjective nature of the evidence when denying his claim. It must either assign some weight to the evidence or provide a reason for its decision not to do so.[14]

Principal has identified nothing in the present record that would support a rejection of Miles's subjective complaints. Though there is no objective evidence of tinnitus, multiple specialists have said there is no objective test for it. *See infra* Section 2. Tinnitus is consistent with hearing loss, for which there are objective tests, and the record indicates that there is undisputed objective evidence of such hearing loss in Miles's case. *See, e.g.*, Dr. Carpenter Advisory Report, J.A 148; Dr. Klein Secondary Advisory Report, J.A. 354. Finally, as the Commissioner of Social Security observed in crediting Miles's account of his symptoms, Miles's long history of hard work supports his credibility on this issue. Decision of the SSA, J.A. 135. We do not mean to suggest that Principal is required on remand to credit Miles's

---

[14] The first point in Miles's letter seeking review of the initial denial was that Principal "did *not* state that the Plan did not credit what Mr. Miles had said about what had happened to him, including the symptoms he had reported to his doctors and had described for Principal." J.A. 53 (emphasis in original). Upon our review of the initial denial, we agree that Miles's credibility was not addressed. And though Principal's final decision suggests strongly that it rejected Miles's description of the severity of his headaches, see J.A. 112, J.A. 144 (twice referring to the fact that such severe headaches typically occur in the first or second decades of a person's life, not in the fifth), it did not similarly disparage his claims about the severity of his tinnitus.

statements regarding the nature and severity of his subjective symptoms. However, considering the present record as a whole, we conclude that Principal acted arbitrarily and capriciously by disregarding Miles's subjective complaints without providing any reason for this decision.

2. *Principal's Request for Objective Evidence Proving that Miles Suffered from Tinnitus Was Unreasonable*

In its final decision, Principal relied on the lack of an objective proof of tinnitus as a basis to deny the claim. J.A. 545 ("The tinnitus did not find an explanation by ENT or by neurology. Specifically, neurologically there was no vascular lesion on (sic) imaging to explain audible tinnitus."). The district court held that this insistence on objective evidence to establish the existence of a disabling impairment was reasonable. *Miles*, 831 F. Supp. 2d at 777-78. Although acknowledging that tinnitus "may be difficult to prove," the district court held that "it was not unreasonable for Principal to require proof of significant impairment beyond Etra's diagnosis." *Id.* at 778. Considering the issue *de novo*, we disagree. A claimant bears the burden of proving that a disability is covered, *see Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 765 (2d Cir. 2002), but plan administrators may not impose unreasonable requests for objective evidence. Here, the record suggests that there is no objective test to prove the presence of tinnitus. It was unreasonable for Principal to request objective evidence of impairment when it had not identified any such test that exists. Accordingly, we conclude that Principal arbitrarily and capriciously relied on Miles's failure to provide objective evidence of tinnitus as a reason to deny his LTD claim without specifying the objective evidence it would expect to see.

In *Hobson v. Metropolitan Life Insurance Co.*, 574 F.3d 75 (2d Cir. 2009), this Court held that a plan administrator may accord less weight to subjective complaints where the claimant is unable to produce objective corroboration. *Hobson*, 574 F.3d at 88. In *Hobson*, a plan administrator informed a claimant that "trigger point tenderness" was a "major criteri[on]

22

for the diagnosis of fibromyalgia," and requested objective evidence of trigger-point tenderness in assessing the disability claim. *Id.* The claimant failed to produce the objective evidence after being notified of the need to do so. This Court concluded that, "[i]n light of this notification," the plan acted within its discretion in denying benefits. *Id.*

Here, in contrast to *Hobson*, the evidence in the record suggests that tinnitus may not be amenable to objective verification. Indeed, the independent evaluator whom Principal retained – Dr. Carpenter – concluded that "there are no objective tests for tinnitus," *see* Carpenter Advisory Report, Nov. 15, 2010, J.A 148. This conclusion was repeated by Dr. Michael Gordon, an ENT specialist retained by Miles, who stated that Miles "is experiencing troublesome tinnitus in both ears, which cannot be measured objectively." J.A. 82.

Whether an alleged impairment lends itself to objective clinical findings is a factual determination to be made by the plan administrators. *See, e.g.*, *Martucci v. Hartford Life Ins. Co.*, 863 F. Supp. 2d 269, 278 (S.D.N.Y. 2012) (noting that is reasonable to require objective evidence documenting the amount of debilitation caused by a particular illness where tests for such evidence exist). Unlike in *Hobson*, Principal did not identify any objective findings that, considering Miles's symptoms, it would reasonably have expected to see. Under these circumstances, we conclude that it was unreasonable for Principal to rely on the lack of objective evidence of tinnitus to deny Miles's claim. *See e.g.*, *Magee v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 308, 318, 321 (S.D.N.Y. 2009) (ignoring "MetLife's erroneous objective evidence requirement" where "in a Catch–22, MetLife acknowledges that there is no test for [chronic fatigue syndrome]," but MetLife nevertheless rejected plaintiff's claim because he "failed to provide 'objective evidence,' establishing that he was suffering from a disabling impairment"); *Fitzpatrick v. Bayer Corp.*, No. 04 Civ. 5134 (RJS), 2008 WL 169318, at *11-12 (S.D.N.Y., Jan. 17, 2008) (distinguishing the question of whether a person suffers from a particular impairment from the question of whether that person is disabled as a result); *see also*

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676-78 (9th Cir. 2011) (holding that a plan administrator abused its discretion when it demanded objective tests to establish the existence of a condition for which there are no objective tests); *Cusson v. Liberty Life Assurance Co. of Boston*, 592 F.3d 215, 227 (1st Cir. 2010) (drawing "a distinction between requiring objective evidence of the diagnosis, which is impermissible for a condition that does not lend itself to objective verification, and requiring objective evidence that the plaintiff is unable to work, which is allowed").

### 3. *Principal Erred by Selectively Considering Evidence in the Record*

Principal failed to support many of its assertions with sound reasoning in the record and, in some instances, made assertions that are contradicted by the record. For example, in both the initial and final denials of Miles's claim, Principal stated that "[i]t's not clear what changed in [Miles's] condition in April of 2009, to prevent him from working." J.A. 109; *see also* J.A. 46. But the record before Principal could hardly have been clearer on the subject. Before the initial denial, Dr. Etra informed Principal that Miles's difficulties began eight months earlier with bilateral ear pain, tinnitus, and hearing loss. Then, just before Miles ceased working on April 17, 2009, he developed significant headaches and dizziness as well. Between the initial denial and the final decision, Dr. Carpenter, the second of the two ENT specialists retained by Principal to review the claim, stated that what had changed in April of 2009 was the onset of headaches and foggy feelings five days before Miles stopped working. J.A. 149. Dr. Carpenter wrote that, "From my record review it appears that the claimant stopped working because of the headaches and foggy feeling along with the loud tinnitus." Principal's assertion that Miles failed to explain why he ceased work is based on a selective reading of the record that is not reasonably consistent with the record as a whole.

Principal also mischaracterized the record when denying Miles's claim. In its initial denial, Principal informed Miles that his treating neurologist, Dr. Haimovic, refused to

speak to Dr. LeForce, the independent neurologist, on privacy grounds even though "*Dr. LeForce* had forwarded an authorization to Dr. Haimovic on two separate occasions." J.A. 47 (emphasis added). This was an unfair characterization of what actually occurred. A fair reading of Dr. LeForce's report reveals that he had asked a third party to send the authorization, and there is no evidence in the record indicating that one had been sent. Finally, in its initial denial, Principal relied on the fact that Dr. Etra wrote "none" in a box asking whether he had restricted the number of hours Miles can sit, stand, stoop, use his hands to push or pull, etc., to conclude that Miles's doctors declined to impose restrictions and limitations on Miles. However, Principal omitted from its decision the fact that Dr. Etra made a statement on the same form noting that Miles is "unable to work" due to "hearing loss, vertigo, [and] tinnitus." Work Status Sheet, J.A 343. Furthermore, the same Work Status Sheet asked as follows: "Considering the limitations and restrictions you've outlined above, if *vocational alternatives* can be identified within these restrictions/limitations, are there any *other* reasons you are aware of that your patient would not be able to return to work?" *Id.* (emphasis added). It is not reasonable to conclude that, by checking "no," Dr. Etra, was indicating that Miles could return to his work as a real estate partner at Venable.

C.     *The Appropriate Remedy*

Miles requests an order directing the award of benefits, but we conclude that such relief is unwarranted. Our precedents make clear that even where we conclude a plan administrator's finding was arbitrary and capricious, we will typically not substitute our own judgment, but rather will return the claim for reconsideration unless we "conclude that there is no possible evidence that could support a denial of benefits." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1074 (2d Cir. 1995); *see also id.* at 1071 (remand for reconsideration required "unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a useless formality") (internal quotation marks omitted). We

cannot reach that conclusion here. Among other things, remand will afford Principal the opportunity to consider the evidence under the appropriate legal standards and, if it wishes, to evaluate Miles. We do not suggest that those are the only appropriate considerations on remand, and we intend no limitation by mentioning them. Principal is expected to provide a full and fair reconsideration of Miles's claim.

A benefit determination is a fiduciary act, and Principal owes plan beneficiaries a special duty of loyalty. *Glenn*, 554 U.S. at 111. This duty requires Principal to interpret and apply plan terms "solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i). While this fiduciary obligation "does not necessarily favor payment over nonpayment," *Varity Corp. v. Howe*, 516 U.S. 489, 514 (1996), Principal is reminded that it may not adopt an adversarial approach toward Miles in the benefits determination.

D.    *Conclusion*

For the foregoing reasons, we conclude that Principal's denial of Miles's claim was arbitrary and capricious. Accordingly, the judgment of the district court is reversed, and the case is remanded to that court with our instructions to return the matter to the plan administrator for further proceedings consistent with this opinion.